**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

---

| | | |
|---|---|---|
| JOSEPH SANNUTTI | : | |
| 2001 Hamilton Street, # 704 | : | |
| Philadelphia, PA 19130 | : | Civil Action No.: 21-10955 (FLW)(DEA) |
| and | : | |
| JOHN HOLAHAN | : | |
| 742 North 19th Street, Unit 5 | : | |
| Philadelphia, PA 19130 | : | |
| and | : | |
| BRADLEY GALE | : | **FIRST AMENDED** |
| 2617 E. Hager Street | : | **CLASS ACTION COMPLAINT** |
| Philadelphia, PA 19125 | : | |
| and | : | |
| MICHAEL LANGE | : | |
| 104 Jennifer Drive | : | |
| Monroe Township, NJ 08831 | : | |
| and | : | **JURY TRIAL DEMANDED** |
| ANDREW DESARNO | : | |
| 1 Patterson Drive | : | |
| Freehold, NJ 07728 | : | |
| and | : | |
| KATHERINE JABLONSKI | : | |
| 927 Marilee Glen Court | : | |
| Durham, NC 27705 | : | |
| and | : | |
| GISELLE VARGAS | : | |
| 58-47 197 Street | : | |
| Fresh Meadows, NY 11365 | : | |
| and | : | |
| NELSON RAMIREZ | : | |
| 2216 Pederson Drive | : | |
| Old Bridge, NJ 08857 | : | |
| and | : | |
| TIMOTHY QUICK | : | |
| 210 Clinton Street | : | |
| Hoboken, NJ 07030 | : | |
| and | : | |
| MALCOLM LAPONE | : | |
| 403 Littleworth Lane | : | |
| Sea Cliff, NY 11579 | : | |
| and | : | |
| KEITH LOCASCIO | : | |
| 86 Glenroy Road E. | : | |
| Fairfield, NJ 07004 | : | |

|                                | :  |
|--------------------------------|----|
| and                            | :  |
| MATTHEW COLOMBO                | :  |
| 3 Harnden Road                 | :  |
| Foxboro MA 02035               | :  |
| and                            | :  |
| KRISTINE KAVANAUGH             | :  |
| 11 Wickwine Lane               | :  |
| Henrietta, NY 14467            | :  |
| and                            | :  |
| DAVID BUBAR                     | :  |
| 318 Greengage Circle            | :  |
| East Amherst, NY 14051         | :  |
|                                | :  |
| Plaintiffs,                    | :  |
|                                | :  |
| v.                             | :  |
|                                | :  |
| W.B. MASON CO., INC.           | :  |
| 59 Centre Street               | :  |
| Brockton, MA 02303             | :  |
| and                            | :  |
| LEO MEEHAN, *individually*     | :  |
| 59 Centre Street               | :  |
| Brockton, MA 02303             | :  |
| and                            | :  |
| CHRIS MEEHAN, *individually*   | :  |
| 59 Centre Street               | :  |
| Brockton, MA 02303             | :  |
| And                            | :  |
| ROGER AHFELD, *individually*   | :  |
| 59 Centre Street               | :  |
| Brockton, MA 02303             | :  |
|                                | :  |
| Defendants.                    | :  |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Michael Lange, Andrew Desarno, Joseph Sannutti, John Holahan, Bradley Gale,

Katherine Jablonski, Giselle Vargas, Nelson Ramirez, Timothy Quick, Malcom Lapone, Keith

Locascio, Matthew Colombo, Kristine Kavanaugh, and David Bubar, (*hereinafter* referred

collectively as "Plaintiffs"), by and through their undersigned counsel, hereby aver as follows on behalf of themselves and all similarly situated current or former employees:[1]

## I. Introduction

1.      Plaintiffs have initiated this action, on behalf of themselves and all similarly situated current and/or former commissioned sales representatives of W.B. Mason Co., Inc. ("WB Mason"),[2] to redress violations by WB, Leo Meehan, Chris Meehan, and Roger Ahfeld (*hereinafter* referred to collectively as "Defendants") of the New Jersey Wage Payment Law ("NJWPL" - N.J.S.A. §§ 34:11-4.1, *et. seq.*) as applicable, the Pennsylvania Wage & Collection Law (43 Pa C.S. §§ 260.1, *et. seq.*), as applicable, the New York Labor Laws (N.Y. Labor §§ 190, *et. seq.*), as applicable and for breach of contract, and for the commission of common-law fraud. Plaintiffs summarily allege herein that Defendants have continually perpetuated fraudulent and unlawful payroll practices consisting of, among other things, ***retroactively*** reducing ***earned*** wages and commissions of commissioned salespeople, sometimes referred to as "Account Executives." Account Executives are hereinafter referred to and abbreviated singularly as "AE," or plural as "AEs."

## II.      Parties

2.      Plaintiffs Michael Lange and Andrew DeSarno are adult individuals who are citizens of New Jersey and at all relevant times performed commissioned sales work for Defendant WB Mason in and throughout New Jersey.

---

[1] The term "Plaintiffs" as used in this lawsuit is intended to and shall be interpreted as named class Plaintiffs, as well as all similarly situated putative plaintiffs (who worked for Defendants from or were deemed based within New Jersey, Pennsylvania and New York).

[2] This particular class action defines the class as those employees of Defendants who were based in New Jersey, New York and Pennsylvania for Defendant WB Mason, as discussed *infra*.

3.      Plaintiff Bradley Gale, Joseph Sannutti and John Holahan are adult individuals who are citizens of Pennsylvania and at all relevant times performed commissioned sales work for Defendant WB Mason in and throughout Pennsylvania.

4.      Plaintiff Katherine Jablonski (North Carolina citizen), Giselle Vargas (New York citizen), Nelson Ramirez (New Jersey citizen), Timothy Quick (New Jersey citizen), Malcom Lapone (New York citizen), Matthew Colombo (Massachusetts citizen), Keith Locascio (New Jersey citizen), Kristine Kavanaugh (New York citizen), and David Bubar (New York citizen), at all relevant times performed commissioned sales work for Defendant WB Mason in and throughout the State of New York.

5.      W.B. Mason is a corporation which has operated over the last several years with approximately 70 distribution centers, over 3,000 employees, and it generally manufactures, distributes and sells office supplies and related products all over the United States.[3] It is a Massachusetts Corporation with its principal place of business in Brockton, Massachusetts.

6.      Leo Meehan ("Defendant LM") is a citizen of the Commonwealth of Massachusetts and, at all relevant times, has been an owner and the Chief Executive Officer ("CEO") of Defendant WB Mason. At all times relevant herein, Defendant LM has personally been involved with, known about, and perpetuated the payroll practices as outlined in this lawsuit.

7.      Chris Meehan ("Defendant CM") is a citizen of the Commonwealth of Massachusetts and, at all relevant times, has been the Chief Operating Officer ("COO") of Defendant WB Mason. At all relevant times herein, he has personally been involved with, known about, and perpetuated the payroll practices as outlined in this lawsuit.

---

[3] Due to the COVID-19 pandemic, Defendant WB Mason's overall internal workforce and operations substantially changed. The summary herein is intended to outline Defendant WB Mason's overall pre-pandemic generalized business operation(s).

8.      Defendants LM, and CM are corporate officers of Defendant WB Mason who make, authorize, and oversee decision-making concerning payroll practices, commissions, marketing, sales, and business operations. They were aware of numerous concerns of illegality by Plaintiffs, but they continued to utilize an unlawful commissions system. They are thus alleged to be individually liable for all actions as set forth throughout this lawsuit.

9.      Roger Ahfeld ("Defendant RA") is a citizen of the Commonwealth of Massachusetts and, at all relevant times, has been a corporate executive of Defendant WB Mason overseeing WB Mason's Human Resources. He is named in this lawsuit individually because he is alleged to have: (a) knowingly ignored complaints of illegality by AEs; (b) attempted to cover up and conceal unlawful payroll practices; (c) and conspired with ownership to perpetuate all fraud and unlawful practices as outlined in this lawsuit.

10.     Defendant WB Mason and all 3 individual defendants operate from 59 Centre Street, Brockton, Massachusetts 02301. They manage and oversee locations in New Jersey, New York and Pennsylvania from this headquarters.

11.     At all times relevant herein, Defendants acted by and through their agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendants.

### III.    JURISDICTION AND VENUE

12.    The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d)(2)(A), the Class Action Fairness Act ("CAFA"). At least one member of each of the putative Class(es) is a citizen of a state different from that of Defendants.

13.    Plaintiffs' and putative Class Members' claims involve matters of interstate interest and, pursuant to 28 U.S.C. § 1332(d)(6), the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

14.    Defendants are subject to personal jurisdiction in New Jersey.

15.    Venue is proper pursuant to 28 U.S.C. § 1391.

### IV.    Factual Background

16.    The foregoing paragraphs are incorporated herein their entirety as if set forth in full.

#### [A] *Information Specific to Named Class Plaintiffs*

17.    At all relevant times herein, Plaintiffs were employed by Defendant WB Mason as commissioned salespeople, sometimes referred to as AEs.[4] AEs are commissioned salespeople who solicit new business and manage existing accounts within which to sell or distribute Defendant WB Mason's products (to third-party commercial businesses and residences).

18.    Plaintiffs' job duties and roles were virtually identical within Defendant WB Mason.

#### [B] Factual Allegations of Class-Wide Wage *and* Fraud Violations

19.    This is a Class Action (specific to the states of New Jersey, New York and Pennsylvania), limited to those AEs who have worked from and within the States of New Jersey, New York, and Pennsylvania (as outlined in significant detail *infra*).

---

[4] For the purposes of this lawsuit, AEs mean only *commissioned* Account Executives.

20.    In an effort to commit wage theft, fraud, and the intentional failure to pay earned commissions to AEs, Defendant WB Mason (*during the 6-year lookback period from lawsuit filing, depending upon the state at issue*): (a) has and continues to refuse to provide commission plans or specific documented commission structures to AEs in an effort to change commission entitlements <u>without notice</u> to AEs on a consistent and pervasive basis; and (b) ***retroactively alter*** commissions ***after they have already been earned***.

21.    What Plaintiffs can and do earn by way of commissions is critical because such commissions generally constitute the primary source of Plaintiffs' income (as they predominantly cover any draw against such commissions).[5]

22.    The **<u>only</u>** documents Plaintiffs receive from Defendant WB Mason are what is referred to as "commission statements." This is *part of the payroll process*. At the end of a various months, Plaintiffs are informed in a commission statement what they earned by way of commissions **<u>for preceding timeframes</u>**, generally at least a month or more.

23.    The commission statements (although they have changed over time due to other varying structures) generally (and as of most recent years) divide products into "Buckets" wherein each product sold by an AE is then subject to *a different* commission depending upon the Bucket in which it appears.

24.    When AEs see the Commission Statement, they: (a) do what is best for their respective accounts; (b) sell all types of products; and (c) heavily and strenuously attempt to sell products *<u>that offer the highest commissions</u>* per their Commission Statements they receive. They

---

[5] In other words, commissions are generally most or all of each AEs income, not some tangential small incentive combined with substantial base pay.

rely upon the commission rate specified in the Commission Statement for what to sell and how much they will earn for a living.

25.    The crux of the unlawful scheme by Defendants though is that AEs sell substantial products based upon their understanding of the commission structure from their prior payroll (and Commission Statement), and then AEs come to find out in a subsequent month that products they already sold were moved to different buckets *resulting in substantially lower commissions*. This is a primary example of the unlawful pay structure of Defendant WB Mason, with many other examples to follow. Defendants blanketly change (*retroactively*) without legally required notice to AEs their: (a) commission pay rates; (b) auto allowances; and (c) commission deductions (and summarily, compensation owed to AEs).

26.    After AEs work to market and sell products generating high commissions, they only learn retroactively in their next payroll and commission statement that the percentages of such commissions were lowered upon payment. Defendants:

(1) **DO NOT** provide Plaintiffs with any set commission plans on a long-term basis;

(2) Require Plaintiffs to rely upon each preceding Commission Statement **as an understanding** of what their commission structure is for selling in the coming month(s) prospectively;

(3) Know that Plaintiffs live and generate an income solely upon their commissions;

(4) **Retroactively lower** commissions *after* Plaintiffs perform work and sales relying upon prior commission statements as to commission structures; and

(5) **DO NOT** provide Plaintiffs with *legally required* notices, verbally or in writing, of reductions in commissions or changes to the commission structure (or buckets) from one commission statement to the next (as to the fraud outlined in this lawsuit).[6]

---

[6] Defendants' payroll system is tantamount to having an hourly employee work on an hourly basis and getting paid at $14.00 per hour in 1 pay period (having the employee believe he will get paid that way in the next pay period based

27.     To aid in better visualizing or understanding the unlawful <u>retroactive</u> commission changes that constitute an unlawful practice and policy companywide within Defendants, Plaintiffs illustrate what transpires monthly with just a few illustrations.[7] **[1] <u>Illustration 1 – March 2018 to May of 2018 Commission Statements</u>**

28.     "Exhibit A," attached hereto, is part of Defendants' commission statement of how commissions were paid for March 2018 sales. "Exhibit B," attached hereto, is a companywide commission statement excerpt of commissions paid for May 2018 sales.

29.     On information and belief, Exhibits A and B (excerpts from slightly longer commission statements) are examples of **<u>the only</u>** information AEs would receive about commissions *at all* during their entire periods of employment. Such information was provided to AEs as part of Defendant WB Mason's payroll process merely to show AEs what they were to be paid in commissions.

30.     A comparison of Exhibits A and B would show that between March 2018 through May 2018, AEs would sell products such as "Blizzard Water," "Data Storage," "HP Toner," and "Keurig Brewer Products." Despite that these items had higher commissions represented in commission statements as of March 2018, ***without notice*** to AEs, Defendants placed the same products in lower-commission generating buckets or simply assigned them lower commission percentages by May 2018. As a result, Plaintiffs worked to sell products expecting one commission

---

upon his payroll), paying $13.00 per hour in the second pay period, and $11.00 in the third pay period *with the hourly employee only finding out what he or she will be paid upon receipt of the next payroll after providing services under expectations from prior compensation offered*. Of course, Plaintiffs are not hourly herein. **<u>But this is the very type of system under which Plaintiffs alleged Defendants unlawfully operate</u>**.

[7] Plaintiffs intentionally only provide examples from the same timeframes in the Spring of 2018, Spring of 2019, and Spring of 2020. All actions occurred continually, monthly, and pervasively (all times of the year). But using the same timeframe each year demonstrates ***how consistent*** Defendants' unlawful commission manipulation was.

– but ***without any notice*** – were paid a lower commission rate **AFTER** having worked for 1-2 months based upon a different written commission structure that had been ***retroactively*** adjusted by Defendants.

31.     The aforesaid manipulation of commission percentages and entitlements to the detriment of AEs **occurred on a monthly basis** within Defendants, and Exhibits A and B are examples of a systemic and companywide unlawful practice of **retroactively** lessening earned commissions of AEs on a monthly basis throughout their employment with Defendants.

### [2] Illustration 2 – March 2019 to May of 2019 Commission Statements

32.     "Exhibit C," attached hereto, is Defendants' companywide commission statement of how commissions were paid for March 2019 sales. "Exhibit D," attached hereto, is a companywide commission statement of commissions paid for April 2019 sales.[8] Although percentages of commissions were adjusted in these Exhibits as well, the purpose of this illustration is to show *another form* of manipulation.

33.     At the <u>very bottom</u> of Exhibits C and D, such documentation demonstrates that:

(1) As of March 2019, AEs were working to earn commissions solely premised upon the "Grand Total % of Sales;"

(2) AEs worked very hard, sold thousands, hundreds of thousands, or millions of dollars' worth of products to Defendants' clientele; and

(3) After operating with the understanding anything AEs were to earn was solely upon the "Grand Total % of Sales" (pursuant to Exhibit C), when paid for past sales in April of 2019 (Exhibit D), AEs had their overall commissions reduced by Defendants <u>retroactively</u> by the addition of a new "Growth and Volume Factor."

---

[8] The commission statements are slightly longer, but Plaintiffs are providing a page as Exhibits for illustration.

34.     This example of *new qualifying factors* (a "growth and volume factor" based reduction) reducing Plaintiffs' <u>already earned</u> commissions was done ***retroactively*** and without the knowledge of any AE until they obtain payment ***for past work***.

### [3] <u>Illustration 3 – Spring of 2020 to Summer of 2020</u>

35.     In the Spring of 2020, Defendants companywide encouraged AEs to sell personal protective equipment ("PPE"), cleaning, janitorial equipment, and sanitizer-related supplies (which were in high demand due to the pandemic). AEs were selling hundreds of thousands of dollars, and in some cases, millions of dollars in such supplies to accounts. Even when such went on back order due to supply exceeding demand during the COVID-19 pandemic, Plaintiffs continued to sell such equipment and supplies on backorder.

36.     By the time AEs <u>were paid</u> for such commissions (months later), the commissions shown to them in commission statements for such equipment / supplies had been so substantially reduced ***<u>retroactively</u>*** that some individual AEs were reduced in commissions individually by well in excess of $20,000.00 *just in that short timeframe*.[9]

### <u>Wage Fraud Purpose & Design</u>

37.     Defendants operate a commission system *unlike any other comparable business* for a specific reason – to steal and manipulate commissions enhancing overall revenue to the business and ownership.

38.     Whenever AEs focused on selling the highest-commission products instead of others to generate substantial income for themselves based upon prior commission statement percentages of commission specified, Defendants lowered the commissions without telling

---

[9] The violations as outlined by way of example in the Spring of 2020 are particularly egregious because: (a) Defendants substantially hiked prices on PPE and related supplies; and (b) <u>generated exceptionally high profit margins</u> prompting (out of sheer greed) the desire to unlawfully reduce compensation nationwide through *<u>a retroactive reduction</u>* of commission percentages as to such sales (to avoid salespeople from obtaining what they legally already earned).

Plaintiffs to have less payroll obligations <u>and</u> to obtain the benefit of profit margin on continuing new orders from Plaintiffs' accounts.

39.    **<u>More drastic</u>** (and less surreptitious) retroactive changes to commissions of Plaintiffs occurred in the Spring of 2017, the Summer of 2018, the Spring of 2019, and in Spring/Summer of 2020. On information and belief, Defendants have admitted to these drastic "retroactive" changes in commission numerous times to AEs internally.

40.    AEs nationwide have been defrauded (as to unlawful commission practices) by millions of dollars by Defendants. As outlined below, Defendants also refuse(d) to share any data with AEs to conceal the scheme.

<u>Other types of Wage Fraud against AEs</u>

41.    The above **<u>3</u>** illustrations comprise the crux of Defendants' unlawful commission scheme. But Defendants practices and policies of skimming and stealing commissions from AEs <u>also include</u> but are not limited to the following:

(1) Defendants make donations to various clients and (upon information and belief) take tax deductions for the donations (attributable only to Defendant WB Mason). Despite such donations being irrelevant to (and separate from) already established sales of Plaintiffs, ***Plaintiffs are reduced*** in their gross sales generation by Defendants' election to make such "donations." Defendants are thus falsely representing to third-party accounts they (as Defendant WB Mason) are making donations while merely reducing the income of Plaintiffs.[10]

(2) Plaintiffs perform work selling on an account and working with various clients only to be told later by Defendants that the bid submitted by Defendants was so low that the account will at that time be treated as a non-commission account (causing Plaintiffs to have worked an account for no commission at all despite upwards of thousands to millions of dollars in such sales). Defendants' practices

---

[10] Defendants never presented Plaintiffs with documents to sign authorizing Defendants to make reductions in their income due to such donations. As a result, there are no documents that permit Defendants to use such donations as a means of reducing Plaintiffs' income.

of claiming various accounts will be non-commission accounts after-the-fact is uniform throughout the United States.[11]

(3) Defendants set a "cost" price to AEs in commission statements that are used to calculate the profit generated by such AEs (for a commission payment). But Defendants **do not list the correct, actual or real cost price** of various products. Defendants use inflated cost prices in commission statements of such products to fraudulently reduce the overall commissions of AEs. Meanwhile, AEs see the same product(s) they sell to accounts being sold at an entirely different cost throughout the company or in different catalogues than as reflected in their commission statements (as what is specified in commission statements is ***falsely inflated*** to reduce commission entitlements); and

(4) Defendants knowingly reduce commissions of AEs by failing to properly calculate water deposits, rebate retention, calculating design time impermissibly, and in many other ways.

42.    Defendants' practices, policies, and directives with respect to commission scamming against Plaintiffs is identical, uniform, and enforced by all New Jersey, New York and Pennsylvania branch management of Defendants against all Plaintiffs (at the direction of every individual Defendant to this lawsuit). There are **numerous** other forms of unlawful commission practices which are also uniform, but this lawsuit is intended to provide broad notice of many such practices for notice purposes only. To provide an example of one of the more complex and intricate illegal practices by way of last example though:

(A) Defendants refer to most of what has been specified in this Complaint as transactional or IBM sales (which, per Defendants, are *primarily* the everyday transactions of products *they already warehouse*). However, Plaintiffs also engage in what Defendants refer to as Hedberg Sales, a/k/a Factory Direct Sales (which are products Plaintiffs sell to the account or client ordering such products that are shipped underlinedirectly from a third-party manufacturer to the client, as opposed to from Defendant WB Mason). These Factory Direct Sales will be referred to herein as "Hedberg sales."

(B) Because Plaintiff's are advanced commissions when a sale is made on Hedberg sales, if payment by the account or client is not made in 60 days or 90 days

---

[11] Plaintiffs do not consent to not being paid commissions on unilaterally noticed non-commission accounts by Defendants, nor have Plaintiffs ever been informed in writing of such standards or exclusions. Per Plaintiffs' commission statements, they are to be paid commissions regardless of Defendants' preferences or choice to offer better deals to certain accounts.

from when payment obligations are supposed to start (**which is upon "delivery"**), Defendants retroactively deduct 25% and then 75% respectively (totaling 100%) from commissions Plaintiffs are supposed to earn in the timeframe when such payment(s) are not made.

(C)   However, Defendants uniformly defraud their AEs in **2** separate ways with the aforesaid unlawful pay practice(s). Defendants' New Jersey, New York and Pennsylvania branch management are encouraged institutionally (and unethically) to "recognize" the income from the sale in the same month in which a Hedberg sale takes place to make the company's numbers look better (*even though* delivery was never made from the manufacturer to the client). But the retroactive deduction against Plaintiffs is only supposed to occur within 60 or 90 days *from "delivery"* of the Hedberg sale products.

(D)   Because Defendants elect to inflate sales numbers *prior to delivery*, the 60 or 90 days per Defendants start running from when Defendants recognize the revenue (for purposes of Defendants "clawback" of commissions). The problem is that delivery of the Hedberg sales products may not occur for weeks or months to the account or client. In turn, the payment obligations of the client or account had just started to run <u>or</u> passed by the time the clawback of commissions occur (explained in the hypothetical illustration below).

(E)   Assume for example the following hypothetical (which is similar to what occurs consistently): (1) Plaintiffs sell Hedberg sales products; (2) Defendants rush to unethically recognize the revenue internally for accounting purposes; (3) Plaintiffs are paid commissions; (4) The manufacturer ships products (or furniture) *7 weeks* <u>*after the order*</u> to the account or client; (5) Defendants had already invoiced the client or account upon recognizing the revenue / sale triggering the 60 or 90 day clock <u>***7 weeks before***</u> delivery; (6) Defendants <u>and</u> the client or account know that payment obligations and timing of payment *only commence* upon "delivery;" (7) Defendants had nonetheless invoiced Defendants ***without any expectation of payment(s) just to claim recognition of the revenue at the detriment of AEs***; (8) Plaintiffs then have their commissions already paid deducted <u>solely because</u> the invoice was issued prematurely 7 weeks early and the client or account had not paid within 1 week of delivery (**which was not expected anyway**); and (9) as a result, a completely non-defaulting client or account that would naturally pay timely or properly, results in Plaintiffs having their commissions rescinded solely because Defendants uniformly and nationally invoice a client or account with no expectation of payment so prematurely.

(F)   This practice is unlawful for many reasons. <u>First</u>, Defendants are unlawfully making a payroll deduction (by way of clawback) contrary to AEs understanding that they only face clawback of earned commission if accounts or clients fail to pay within 60 or 90 days from when payment obligations commence. <u>Second</u>, Plaintiffs understand that they are supposed to be given

14

back the commissions already earned once the client or account does pay, even if after 60 or 90 days. But Defendants have ***no policy of tracking or automatically paying back*** Plaintiffs after clawback. Instead, Defendants put the burden on Plaintiffs to catch, notice, and immediately seek approval directly from Defendant CM for return of such owed commissions. Hence, on a weekly basis Plaintiffs are not properly credited back their earned commissions because Defendants do not automatically return owed commissions (and many do not have the knowledge or ability to track such data). <u>Third</u>, when Plaintiffs are paid commissions initially, they are fully taxed in payroll. When Defendants deduct what they would pay from earnings, Plaintiffs are not credited back with such taxation for income they were no longer receiving. Then, in the event some ultra-sophisticated Plaintiffs do actually track and get approval for return of such rescinded commissions, they are paid again the same prior commission <u>subject to tax again in their next payroll</u>.

(G) Defendants' practices outlined in this example are illustrative of its exceedingly poor, manipulative, and fraudulent commission practices.

43.    In sum, Defendants basically determine what profit goals they desire to meet companywide and alter figures in commission statements towards all AEs on a uniform basis, even though illegal, to ensure such financial goals are met by defrauding all AEs nationwide. *The implementation and practices supra (and throughout this lawsuit) <u>are applied in the exact same manner to every AE at every location of Defendants</u>.*

## Willful Intent to Conceal Calculations by Defendants

44.    Defendants have refused to provide AEs with any documents or information in writing about: (a) <u>a set</u> commission "plan" within Defendants; (b) how commissions are calculated; (c) changes related to their commission plans; and (d) criteria specified in their commission statements. Requests across each relevant state by AEs for this information has been denied or ignored.

45.    When one commission based AE working for Defendant WB Mason in New Jersey demanded commission plan information **as to his own compensation**, this employee was presented with a "Confidentiality And Non-Disclosure Agreement" ("NDA") by Defendant WB

Mason's Vice President of Human Resources requiring that in order for him to see his own compensation data, he would have to: (a) execute the NDA; (b) not disclose to anyone or other employees Defendants' own "compensation plan;" and (c) face "termination" if Defendants were not satisfied with Plaintiff's handling of the "compensation plan" that he and other AEs worked under and were paid by within Defendants.

46.    Defendants maintain a uniform practice and policy of <u>refusing</u> to share any compensation information with AEs *so that they are able to freely manipulate commission fraudulently* and in violation of New Jersey, New York and Pennsylvania wage laws. The employee within paragraph 43 is merely an example of the overt acts of concealment in wages statements, but this employee in fact was <u>never</u> provided with any documents as requested, nor a "package" explaining Defendant's commission structure as he was also promised.

### Recorded Knowledge of Illegality and Admissions by Management

47.    Many AEs have complained about retroactive commission reductions, improper commission calculations, and refusal to provide documentation to understand why Defendants retroactively change earned commissions. However, one commissioned AE recorded one such discussion in mid-2019 with high-level management.

48.    Eric Gervais is and remains a Regional Manager of Defendant WB Mason who reports directly to the executives named in the above-captioned lawsuit.

49.    During a *recorded* conversation in mid-2019, Gervais communicated with one commissioned AE. During this conversation, the following dialogue took place:

   ### *(i) The AE's concerns*:

   - Employee: "I believe WB Mason is breaking the wage payment laws in NJ;"

- Employee stated Defendant WB Mason is "retroactively" changing commissions;

- Employee complained that: "These sales were already done" . . . "After the fact" . . . there is "changing of the compensation and then applying it to work that has already been done" . . . "That's not legal."

- Employee requested "12 months" of commission statements stating: "I have no information on these commission changes" and "I need hard facts of how this growth scale works and actual bucket system" and asked "What are the differences between the commission plan we were under before and now?"

  *(ii)* ***Responses by Gervais:***

- "Masons can go in and essentially do whatever they want" . . . "the company has the right to pay it's salespeople however it wants."

- I cannot give you any documents about your compensation today, nor can you keep anything.

- WB Mason plans to send all AEs a package explaining how commissions work (***but this was false***, as nothing was ever provided to any AE following this recorded conversation).

- Defendant WB Mason can retroactively change your pay if it wants.

- "I am not saying I agree with the way it's communicated" . . . the company may be under "financial stress."

- "It if was up to me, I would of said on next statement this is the way we are paying you" . . . "I expressed that to everyone at the company."

- But they checked with their lawyers and they can even change my salary for time I worked in the past retroactively.

50.    Gervais acknowledged ownership of Defendants was aware: (1) of the allegations of illegality; (2) that Defendants claim they can retroactively change commissions of AEs; and (3) that the practices as outlined in this lawsuit are systemic.

51.    In a recorded conversation between this same employee, Iannaccone (Sales Manager), Cristina Hall (NJ Branch Manager), and Gervais (NJ Regional Manager) [collectively

"management"] *in late 2019*, such management: (a) admitted to problems; (b) admitted rules are changed retroactively; (c) acknowledged this employee's concerns of illegality, smoke and mirrors, and concerns with retroactive commission changes; (d) explained the company has to do what it has to do to financially survive in a tough and competitive industry; (e) told this particular employee his complaints of commission violations are "disruptive," referred to him as a "jerk" for raising such complaints, and they discouraged him from getting a lawyer, threatened that if ownership knew he consulted a lawyer he may have serious problems, and told this employee if he doesn't like the commissions system changing at times to find another job. When employee point-blank repeated that commissions are changed "retroactively," such management said he was "correct."

### The Commissions Process and Decision Makers

52.    Defendants CM and LM are corporate officers and/or owners who have established, perpetuated, and condoned the unlawful payroll scheme described herein. They have created a plan to avoid ongoing complaints through deflection <u>and</u> prohibited communication from AEs with those having knowledge of the commission manipulation.

53.    Defendants CM and LM require all commission calculations to be processed through Tonya Nunnelly ("Nunnelly"). All AEs <u>are strictly prohibited</u> from communicating with Nunnelly **<u>or</u>** executive management. Thus, AEs are not permitted to communicate with anyone who actually engages in the commission decision making or processing of commissions.

54.    When AEs complained to local and regional management (such as Gervais), they are only told by such management that they have nothing to do with processing, changing, establishing, or handling commissions. AEs are promised at some point in the future documentation will be shared, but such information is **<u>never</u>** disseminated or forthcoming.

55.    When AEs attempt to complain to the highest levels of Human Resources Management, such as Defendant RA: (a) AEs are stonewalled; (b) lied to; (c) presented with an NDA threatening potential termination; and (d) instructed they face liability if they communicate with colleagues.

56.    These individuals have established the aforesaid *practice* is *uniform* and handled in the same manner with every AE throughout New Jersey, New York and Pennsylvania.

### Defendants have indefensibly violated applicable laws

57.    When Plaintiffs received a commission statement reflecting a commission rate, they relied to their detriment that this would be the way they were paid in the subsequent commission statement. This did not happen.

58.    Plaintiffs consistently received commission statements reflecting payroll for lesser commission rates than existed ***at the time such Plaintiffs performed the actual labor***. Pursuant to the NJWPL, any employer is statutorily required to "notify his employees of any changes in the pay rates or pay days prior to the time of such changes." N.J. Stat. § 34:11-4.6(b). This did not happen.

59.    There is no question that "commissions" are considered "wages" under the NJWPL. The definition section of the NJWPL states: "Wages means the direct monetary compensation for labor or services rendered by an employee, where the amount is determined on a time, task, piece, ***or commission basis*** excluding any form of supplementary incentives and bonuses which are calculated independently of regular wages and paid in addition thereto." N.J. Stat. § 34:11-4.1(c)(Emphasis added).

60.    In *Winslow v. Corp. Exp., Inc*., 364 N.J. Super. 128, 141, 834 A.2d 1037, 1045 (App. Div. 2003), the Court addressed a very similar fact pattern (relative to a class action

19

involving salespeople) as set forth in this lawsuit. Therein, the Appellate Division held that **any** changes to an employee's commission structure without notice prior to payment will constitute a violation of the NJWPL. Moreover, the Court explained (*just as in this case*), efforts to conceal the payment process amply demonstrated not only breach of contract but also "common law fraud."[12]

61.     In New Jersey, the statute of limitations (or look-back period) for wage violations under the NJWPL is **6 years** from date of lawsuit filing. *See Meyers v. Heffernan*, 2014 U.S. Dist. LEXIS 92117, at *18 (D.N.J. 2014); *see also* N.J. Stat § 34:11-58 ("an employee may file a claim for wages against an employer" . . . "up to six years prior to the date the claim for wages is filed").

62.     Employers who commit violations of the NJWPL, as herein, "shall pay the employee the wages owed plus liquidated damages equal to not more than 200% of the wages owed." Thus, Defendants owe every New Jersey-based plaintiff and class-member in this lawsuit $3.00 for every $1.00 such employees were not properly paid during the course and scope of their employment (often referred to as treble damages).

63.     Pursuant to the Pennsylvania Wage Payment and Collection Law(s), 43 Pa C.S. §§ 260.1, *et. seq* – "PAWPCL," Defendants have violated the PAWPCL in numerous ways.

64.     Under the PAWPCL, "Wages" are defined to include "all earnings of any employee, regardless of whether determined on time, task, piece, commission or other method of calculation."

65.     Under the PAWPCL, "Every employer shall pay all wages . . . ***due to his employees*** on regular paydays," which includes "commissions."

---

[12] *See also Saiyed v. Archon, Inc*., 2021 U.S. Dist. LEXIS 53465, at *7 (D.N.J. 2021)(stating it violates the NJWPL to change one's pay without notice); *Interactive Telcoms. Servs. v. Mil-Comm Prods*., 2009 N.J. Super. Unpub. LEXIS 2318, at *21 (App. Div. 2009)(affirming jury verdict for retroactive pay reductions without notice under NJWPL).

66.    Under the PAWPCL, "It shall be the duty of every employer **to notify** his employees . . . of payment and the rate of pay and the amount of any fringe benefits or wage supplements to be paid to the employee . . . **and any change** with respect to any of these items **prior to the time of said change**."

67.    Defendants did not notify the Pennsylvania-based Plaintiffs in advance of commission changes, and Defendants further engaged in unlawful and prohibited wage deductions. Pursuant to the PAWPCL, <u>only</u> "deductions provided by law" are permitted from employee compensation (not all the gratuitous and deceptive deductions engaged in by Defendants).

68.    Under the PAWPCL, there is a 3-year statute of limitations for such claims; and hence, any Plaintiffs (as herein) are permitted a 3-year lookback period for all unlawful and fraudulent reductions in their compensation without consent or notice.

69.    Pursuant to NY Labor Law §§ 190 ("the NY Labor Law"), Defendants have violated the NY Labor Law in numerous ways.

70.    Under § 190, "Wages" are defined as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, **commission** or other basis." Hence, all commissions earned by New York-based Plaintiffs during their employ with Defendants were "wages" governed by § 190.

71.    Under § 191, "commissioned salespersons" **are required** to be: (1) provided with a commission plan "**reduced to writing**, *signed by both the employer and the commission salesperson*, kept on file by the employer for a period of not less than three years and made available" . . . "upon request." Defendants **made no effort** whatsoever to comply with this statutory mandate, refused to provide commission plans, **never** had commission plans executed,

and *intentionally avoided such statutory obligations to manipulate commission pay*. *See also* §191-b (same).

72.     Under § 191-a, "commissions" due to New York-based Plaintiffs include any "commission due for services" according to the terms of any applicable agreement. Each month, these Plaintiffs worked under a set of commission rates believing they would govern the services they performed. Then, without notice, such commission rates changed only upon payment. **This is *per se* unlawful**.

73.     Additionally, AEs had improper deductions taken from their compensation via "donations" made by Defendants, claw-back of monies for alleged non-payment(s) by third parties, and in other ways. This was *per se* unlawful. Under § 193, **no deduction** from earned commissions is legally permitted by Defendants unless "expressly authorized *in writing* by the employee **and** are for the benefit of the employee." Defendants intentionally refused to document anything or abide by statutory requirements in New York.

74.     Defendants *retroactively reduced earned commissions* **without notice** to New York-based Plaintiffs on a consistent basis during their tenures. Pursuant to § 193, whenever changes are made to pay or benefits, "the employer shall, as soon as practicable, but in each case before any increased deduction is made on the employee's behalf, **notify the employee *prior to the implementation of the change***." New York-based Plaintiffs were only notified after changes to their compensation were being made. And such changes were required to be notified **in writing** prior to implementation, which never occurred. *See* § 193(b).

75.     And finally, Defendants so pervasively violated NY Labor Laws, they completely refused to even comply with § 195 of the Labor Law. Defendants were **statutorily required** to:

> (1) "Provide . . . employees" . . . "in writing" . . . "a notice containing the following information: the rate or rates of pay and basis thereof;"

(2) "Obtain from the employee a signed and dated written acknowledgement" of Defendant's "notice" of pay structure;

(3) "Notify his or her employees **in writing** of any changes to the information" related to pay "**at least seven calendar days prior the time of such changes**;" and

(4) Retain all signed and executed acknowledgement of employee compensation structures and new notices executed by employees of any changes **for no less than six years**.

76.     Defendants made **no objective effort** to comply with any aspects of the NY Labor Law(s). Defendants **never** had employees sign commission plans, receive any written notices of changes, sign any new policies on commission changes, and they blanketly changed whatever they wanted retroactively. Defendants' entire payroll scheme is illegal throughout New York.

77.     Under § 191-c, when a commissioned salesperson is not properly paid all owed commissions, that commissioned salesperson "shall" be automatically entitled to "double damages," "attorney's fees," "court costs," and "disbursements." This of course is in addition to other penalties available (such as $50 per-day notice violations).

78.     In New York, the statute of limitations (or look-back period) for wage violations under the NY Labor Law is **6 years** from date of lawsuit filing. *See* § 198(3).

79.     New York-based Plaintiffs are entitled to unpaid wages, treble damages, attorney's fees, interest, costs, and other applicable damages during the 6-year look-back period.

### Class Action Applicability & Class Parameters

80.     The legal theory of this class action is as follows:

(1) This class action consists solely of AEs who were either based in or working from New Jersey, New York, or Pennsylvania for Defendants.

(2) This class action consists of a discrete timeframe, a 6-year look-back time period from date of filing of this lawsuit for claims arising under New Jersey

and New York law, and a 3-year look-back period for claims arising under Pennsylvania law.

(3) This class action asserts Defendants utilized a systemic and uniform practice and policy ide of illegally and fraudulently reducing commissions of employees through a business practice (as explained in detail *supra*). Thus, the claims and defenses are identical in every respect to all class members.

81.    A class action is an appropriate means to resolve this type of case and the underlying allegations, because:

- Pursuant to Fed.R.Civ.P. 23(a)(1) the three state law classes at issue are each so numerous that joinder of all members is impracticable. There are approximately 273 individuals who have or could have asserted the claims identified in the preceding paragraphs who have not already asserted those claims and/or adjudicated those claims, including approximately 83 New Jersey AEs, 145 New York AEs, and 45 Pennsylvania AEs.

- Pursuant to Fed.R.Civ.P. 23(a)(2), the same questions of fact and law are common and typical

- within each of the three state law classes, the sole question is whether Defendants' policies (uniformly enforced as to its AEs) resulted in unlawfully withheld or retroactively reduced commissions in violation of the various state laws at issue.

- Pursuant to Fed.R.Civ.P. 23(a)(3), the claims and defenses are the same as to all Parties. Defendant will likely contest a uniform practice whereas all Plaintiffs' legal claims hinge on establishing such an unlawful practice.

- Pursuant to Fed.R.Civ.P. 23(a)(4), the representatives are a good cross-section of long-term (many-year) employees who will fairly and adequately represent the interests of the class.

- Pursuant to Rule 23, a class action is an appropriate vehicle for resolution of this case because there is a risk of over 100 inconsistent or varying adjudications, a high risk of inefficiency and waste of party or judicial resources, and no interests could be impeded by class adjudication.

**Count I**
**Violations of New Jersey Wage Payment Law ("NJWPL")**
**(Failure to properly pay earned commissions)**

82.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

83.    NJ Plaintiffs and all similarly situated NJ employees assert they are owed "wages," a term that is inclusive of "commissions."

84.    Defendants have engaged in uniform and undeniable practices within the State of New Jersey that are unlawful. Class-wide violations of the NJWPL have taken place as fully outlined above, and Plaintiffs seek all available relief for such violations.

**Count II**
**Violations of New York Labor Law (at §§ 190 *et. seq.*)[13]**
**(Failure to properly pay earned commissions)**
**- Against All Defendants -**

85.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

86.    NY Plaintiffs and all similarly situated NY employees assert they are owed "wages," a term that is inclusive of "commissions."

87.    All commissions not paid, skimmed, or reduced as outlined in this lawsuit were earned commissions that were thereafter not paid to Plaintiffs and similarly situated putative plaintiffs.

88.    Defendants have engaged in uniform and undeniable practices within the State of New York that are unlawful. Class-wide violations of the Labor Law have taken place as fully outlined throughout this lawsuit, and Plaintiffs seek all available relief for such violations.

**Count III**
**Violations of Pennsylvania Wage Payment and Collection Law ("PAWPCL")**
**(Failure to properly pay earned commissions)**

---

[13] Count II encompasses all possible statutes governing wages in the State of New York that could reasonably pertain to the violations as outlined in this lawsuit.

89.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

90.     PA Plaintiffs and all similarly situated PA AEs assert they are owed "wages," a term that is inclusive of "commissions."

91.     Defendants have engaged in uniform and undeniable practices within the Commonwealth of Pennsylvania that are unlawful. Classwide violations of the PAWPCL have taken place as fully outlined throughout this lawsuit, and Plaintiffs seek all available relief for such violations.

### Count IV
### Breach of Contract
### (Failure to properly pay earned commissions)

92.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

93.     Each and every time Plaintiffs received a commission statement, set commission rates were specified. Plaintiffs operated under the promise of receipt of such commissions.

94.     Without notice, Plaintiffs received less commissions than assured in preceding commission statement (after having already performed work).

95.     These actions, in addition to constituting state specific statutory violations, also constitute a breach of contract actionable under the laws of each of the States of New Jersey, New York and the Commonwealth of Pennsylvania.

### Count V
### Common Law Fraud
### (Failure to properly pay earned commissions)

96.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

97.     Defendants have engaged in a scheme of defrauding AEs by *inter alia*:

(1) Having AEs rely upon set commission structures in commission statements;

(2) Changing the pay structure after AEs performed work and sales to lessen and reduce commissions;

(3) Falsely adjusting commissions owed through many other means as outlined in this lawsuit; and

(4) By creating a national scheme to evade complaints, inquiries or to provide any details to inquiring or complaining AEs.

**Count VI**
**<u>Unjust Enrichment</u>**
**(Failure to properly pay earned commissions)**

98.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

99.     Plaintiffs all worked to their detriment expecting set commissions and compensation. Defendants should be disgorged of their ill-retained benefits of work performed by AEs.

100.    This claim is specifically pleaded in the alternative as an equitable claim in the event that any legal claim cannot – for any reason – be established

**WHEREFORE**, Plaintiff prays that this Court enter an Order that:

A.      Certifies settlement classes with respect to the classes of Plaintiffs in New York, New Jersey, and Pennsylvania outlined above, and approves said settlement(s) as fair and reasonable under Fed. R. Civ. P. 23.

B.      Directs Defendants to compensate Plaintiffs (and all similarly situated AEs) for all compensation to which they have been deprived in the last 6 years dating back from the filing of this lawsuit;

C. Awards Plaintiffs (and all similarly situated AEs) liquidated, treble or penalty damages, as permitted by applicable law, in an amount determined by the Court or trier of fact to be appropriate to punish Defendants for willful, deliberate, malicious and outrageous conduct and to deter Defendants or other employers from engaging in such misconduct in the future;

D. Accords Plaintiffs any and all other equitable and legal relief the Court deems just, proper and appropriate;

E. Awards Plaintiffs reasonable costs and expenses of this action and reasonable legal fees;

F. Molds any verdict in favor of Plaintiffs to maximize the financial recovery available to Plaintiffs; and

G. Affords Plaintiffs a trial by jury.

<div style="margin-left:40%">

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

*/s/ Ari R. Karpf*

By: _____
Ari R. Karpf, Esq.
Christine E. Burke, Esq.
3331 Street Road
Two Greenwood Square, Suite 128
Bensalem, PA 19020

</div>

Dated: December 27, 2022